BETH A. ROSS (SBN 141337)
bross@leonardcarder.com
AARON D. KAUFMANN (SBN 148580)
akaufmann@leonardcarder.com
DAVID P. POGREL (SBN 203787)
dpogrel@leonardcarder.com
ELIZABETH R. GROPMAN (SBN 294156)
egropman@leonardcarder.com
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, California 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEAN ALEXANDER, *et. al.*, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>vs.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC. et. al.,<br><br>                    Defendant. | Case No: 3:05-cv-38 EMC<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:     April 7, 2016<br>Time:    1:30 PM<br>Dept.:    Courtroom 5 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on April 7, 2015, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 5 of the United States District Courthouse located at 450 Golden Gate Ave., 17th Floor, San Francisco, California, before the Honorable Edward Chen, Plaintiffs Dean Alexander, Peter Allen, Albert Anaya, Suzanne Andrade, Jarrett Henderson, Ely Ines, Jorge Isla, Paul Infantino, Eric Jeppson, Gupertino Magana, Bernard Mendoza, Jesse Padilla, Marjorie Pontarolo, Joey Rodriguez, Dale Rose, Allen Ross, Agostino Scalercio, and Anthony Ybarra ("Plaintiffs") will and hereby do move this Court for an Order: (1) granting final approval of the proposed class settlement; (2) confirming as final the Court's preliminary certification of the Meal and Rest Period Settlement Subclass for settlement purposes only; (3) determining that adequate notice was provided to the Class and Subclasses; (4) confirming the appointment of the Impact Fund and California Rural Legal Assistance Foundation as *cy pres* beneficiaries of any residual funds; and (5) dismissing this lawsuit with prejudice while retaining jurisdiction over the case and the Parties to the extent necessary to implement the terms of the Settlement Agreement until each act agreed to be performed by the Parties under the Settlement has been fully performed.

Plaintiffs based this motion on this Notice of Motion and Motion; the Memorandum of Points and Authorities in support of this Motion (attached below); the Settlement Agreement (previously filed, Dkt. No. 149, Ex. 1); the Declaration of Beth Ross in Support of Plaintiffs' Amended Motion for Preliminary Approval (Dkt. No. 149); the Declaration of Beth Ross in Support of Motion for Final Approval of Class Action Settlement (filed herewith); the Declaration of Amanda Myette Regarding Notice and Settlement Administration (filed herewith); the argument of counsel; and all other papers and records on file in this matter.

Respectfully submitted,
LEONARD CARDER, LLP

DATED: March 3, 2016          By:     _/s/ Beth Ross_____
                                       Beth Ross
                                       Aaron Kaufmann
                                       David Pogrel
                                       Elizabeth Gropman
                                       *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   FACTUAL & PROCEDURAL BACKGROUND .......................................................... 1

III.  TERMS OF THE SETTLEMENT ............................................................................... 6

    A.  The Class Membership and Recovery Periods ................................................... 6

    B.  Monetary Relief to Class Members ..................................................................... 7

    C.  Settlement Administrator and Class Notice ....................................................... 9

IV.   NOTICE PROCESS, OBJECTIONS AND EXCLUSIONS.................................... 10

V.    ARGUMENT ............................................................................................................... 11

    A.  The Settlement Meets the Criteria for Final Approval ................................... 11

    B.  The Settlement is Fair Given the Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation. ................................. 12

        1.  The Settlement Consideration and Allocation Are Fair ........................................... 13

        2.  The Settlement Reflects the Informed Views of Experienced Counsel and Is the Product of Serious, Arms-Length Negotiations Conducted After Extensive Discovery and Investigation ................................................................... 14

        3.  The Reaction of the Class Supports Approval ........................................... 15

        4.  The Court Should Overrule the Formal Objections Filed by Marin Marquez, Rafick El-Hani, and Henrik Zohrabians ........................................................... 15

            a.  Trucks with a Gross Vehicle Weight Rating of 10,001 Pounds or More Do Not Qualify For the Overtime Subclass (Marquez) ................................... 16

            b.  The Settlement Does Not Release Claims of Non-Class Member Secondary Drivers' Against FXG; Class Members Do Not "Supplant" FXG For Liability (El-Hani)................................................................................. 16

            c.  The Claim Form is Justified Under the Circumstances and Did Not Depress Claims Rate (Zohrabians and El –Hani)........................................... 17

            d.  The Opt-Out Procedure Protects Class Members Due Process; The Notice Opt-Out and Objection Instructions Are Clear (Zohrabians) ...................... 19

            e.  Plaintiffs Conducted a Detailed and Reasoned Maximum Exposure Analysis Allowing the Court and Class to Gauge the Reasonableness of the Settlement (Zohrabians) ................................................................. 21

            f.  The Settlement Value is Fair in Light of the Risks Presented By FXG's Efforts to Reduce Class Membership, Liability Period, and Recoverable Damages (Zohrabians) ................................................................. 23

            g.  The Named Plaintiffs are Adequate Representatives Who Do Not Have a Conflict With the Class (Zohrabians)................................................. 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

h. There is No Conflict Between Class Members and Non-Class Members (Zohrabians) ...................................................... 29

i. Class Counsel Are Adequate (Zohrabians) ........................................ 29

j. The "Clear Sailing" Clause Does Not Signal Collusion Where, As Here, Fees Come From Common Fund (Zohrabians and El-Hani)..................................... 31

k. Counsel's Fee Request is Appropriate and Warranted  (El-Hani)...................... 32

C.    Confirmation of the Court's Provisional Class Certification of the Meal and Rest Period Settlement Subclass is Appropriate. ............................................. 35

D.   The Court-Ordered Notice Program Is Constitutionally Sound ........................................ 36

VI.  CY PRES APPOINTMENT ............................................................... 37

VII.    CONCLUSION ............................................................... 38

1

2

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Acosta v. Trans Union, LLC*,
   243 F.R.D. 377 (C.D. Cal. 2007)..................................................................... 18

*Balderas v. Massage Envy Franchising, LLC*,
   Case No. 12–cv–06327 NC, 2014 WL 3610945 (N.D.Cal., July 21, 2014) ...................... 14

*Barbosa v. MediCredit, Inc.*,
   2015 WL 1966911 (C.D. Cal. May 1, 2015)........................................................ 19

*Barcia v. Contain–A–Way, Inc.*,
   No. 07cv938, 2009 WL 587844 (S.D. Cal. 2009) ................................................. 15

*Barnes v. Equinox Group, Inc.*,
   2013 WL 3988804 (N.D. Cal. Aug. 2, 2013) ....................................................... 19

*Bayat v. Bank of the West*,
   2015 WL 1744342 (N.D. Cal. Apr. 15, 2015)...................................................... 31

*Bowling v. Pfizer*,
   922 F.Supp. 1261 (S.D. Ohio 1996) ................................................................ 33

*Burns v. Elrod*,
   757 F.2d 151 (7th Cir. 1985) ......................................................................... 36

*Chaudry v. City of Los Angeles*,
   751 F.3d 1096 (9th Cir. 2014) ........................................................................ 34

*Ching v. Siemens Industry, Inc.*,
   2014 WL 2926210 (N.D. Cal. June 27, 2014)..................................................... 19

*Churchill Vill., LLC. v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) ................................................................... 11, 36

*Cicero v. DirectTV, Inc.*,
   2010 WL 2991486 (C.D. Cal. July 27, 2014) ..................................................... 19

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ....................................................................... 11

*Cruz v. SkyChefs Inc.*,
   2014 WL 2089938 (N.D. Cal. 2014) ............................................................... 26

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) .................................................................................... 36

*Garner v. State Farm Mut. Auto. Ins. Co.*,
   No. CV 08 1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ......................... 11, 12

*Gooch v. Life Investors Ins.*,
   672 F.3d 402 (6th Cir. 2012) ......................................................................... 31

*-iii-*

*Gribble v. Cool Transports, Inc.*,
  2008 WL 5281665 (C.D. Cal. Dec. 15, 2008) ............................................................... 19

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................................ 11, 36

*Hatfield v. Halifax PLC*,
  564 F.3d 1177 (9th Cir. 2009) ....................................................................................... 28

*In re Baldwin-United Corp. Litig.*,
  1986 WL 12195 (S.D.N.Y.) ........................................................................................... 32

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ............................................................................ 31, 33, 35

*In re Easysaver Rewards Litig.*,
  921 F. Supp. 2d 1040 (S.D. Cal. 2013) ......................................................................... 32

*In re FedEx Ground Package System Inc. Employment Practices Litig.*, (No. II)
  , 381 F. Supp. 2d 1380 (J.P.M.L. 2005) ...................................................................... 2, 3

*In re High-Tech Employee Antitrust Litig.*,
  2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ................................................................ 32

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ........................................................................................ 13

*In re MGM Grand Hotel Fire Litig.*,
  660 F. Supp. 522 (D. Nev. 1987) .................................................................................. 32

*In re Nasdaq Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................................... 33

*In re Omnivision Technologies, Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................................ 15

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  106 F. Supp. 2d 721 (D.N.J. 2000) ............................................................................... 32

*In re Shell Oil Refinery*,
  155 F.R.D. 552 (E.D. La. 1994) .................................................................................... 33

*In re Southwest Airlines Voucher Litig.*,
  799 F.3d 701 (7th Cir. 2015) ........................................................................................ 31

*In re Washington Public Power Supply Sys. Sec. Litig.*
  19 F.3d 1291 (9th Cir. 1994) ........................................................................................ 33

*La Fleur v. Med. Mgmt. Intern., Inc.*,
  2014 WL 2967475 (C.D. Cal. June 25, 2014) ............................................................... 19

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) ................................................................................... 20, 23

*Ma v. Covidien Holding, Inc.*,
  No. SACV 12–02161–DOC (RNBx), 2014 WL 360196 (C.D. Cal. Jan. 31, 2014) ........... 13

*Mangold v. California Public Utilities Comm'n,*
    67 F.3d 1470 (9th Cir. 1995) ......................................................................... 34

*Myles v. AlliedBarton Sec. Serv. LLC,*
    2014 WL 6065602 (N.D. Cal. 2014) ............................................................ 26

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*
    221 F.R.D. 523 (C.D. Cal. 2004) ............................................................ 14, 15

*Officers for Justice v. Civil Serv. Comm'n,*
    688 F.2d 615 (9th Cir.1982) ................................................................... 11, 12

*Radcliffe v. Experian,*
    715 F.3d 1157 (9th Cir. 2013) ....................................................................... 25

*Rodriguez v. West Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ................................................................. passim

*Sandoval v. Tharaldson Employee Mgmt., Inc.,*
    2010 WL 2486346 (C.D. Cal. June 15, 2010) ............................................. 19

*Sioux Nation of Indians v. United States,*
    227 Ct. Cl. 404, 650 F.3d 244 (1981) ........................................................... 33

*Smith v. American Greetings Corp.,*
    2016 WL 362395 (N.D. Cal. Jan. 29, 2016) ................................................ 31

*Staton v. Boeing Corp.,*
    327 F3d 938 (9th Cir, 2003) ......................................................................... 26

*Stokes v. Interline Brand, Inc.,*
    2014 WL 5826335 (N.D. Cal. 2014) ............................................................ 26

*Sylvester v. Cigna Corp.,*
    369 F. Supp. 2d 34 (D. Me. 2005) ................................................................ 18

*Tijero v. Aaron Brothers, Inc.,*
    No. C 10-01089-SBA, 2013 WL 6700102 (N.D. Cal. Dec. 19, 2013) ............... 14

*Torrisi v. Tucson Elec. Power Co.,*
    8 F.3d 1370 (9th Cir. 1993) .......................................................................... 37

*Weinberger v. Great Northern Nekoosa Corp.,*
    925 F.2d 518 (1st Cir. 1991) ........................................................................ 31

*White v. Experian Info. Solutions,*
    2014 WL 1716154 (C.D. 2014) .................................................................... 30

**STATE CASES**

*Brinker Restaurant Corp. v. Superior Court (Hohnbaum)*
    53 Cal.4th 1004 (2012) ............................................................................ 3, 4

*Ketchum v. Moses,*
    24 Cal.4th 1122 (2001) ................................................................................ 34

**FEDERAL STATUTES**

29 U.S.C. § 2617(a)(1)(b) .................................................................................................. 2

349 U.S.C. § 31132 ........................................................................................................ 16

**STATE STATUTES**

California Civil Code §1542 .......................................................................................... 28

California Labor Code §§ 226.7, 510 ...................................................................... 6, 27

**FEDERAL RULES**

Fed. R. Civ. P. 23(b)(3) ............................................................................................... 36

Fed. R. Civ. P. 23(C)(2) .............................................................................................. 37

FED. R. CIV. P. 23(c)(2)(B) ......................................................................................... 37

Fed. R. Civ. P. 23(e) ............................................................................................ 11, 36

FED. R. CIV. P. 23(e) (1) .............................................................................................. 36

FED. R. CIV. P. 23(e) (2) .............................................................................................. 11

**OTHER AUTHORITIES**

Manual for Complex Litigation (Fourth) § 21.61 (2004) ............................................. 11

## I.   INTRODUCTION

On October 22, 2015, this Court granted preliminary approval of the $226,500,000 class settlement ("Settlement") reached in this action against Defendants FedEx Ground Package System, Inc., and its division FedEx Home Delivery ("Defendant" or "FXG").  Dkt. No. 179. The Settlement resolves state wage and hour claims on behalf of 2,016 individuals who have been previously identified as potentially eligible to participate in the litigation as members of the General Class, the Overtime Subclass, and/or the Meal and Rest Period Settlement Subclass.  *See* Dkt. No. 149-1, Ex. 1 (Settlement Agreement).  Following the Court's preliminary approval order, Plaintiffs' filed a separate motion for attorneys' fees and class representative incentive awards on November 13, 2015.  Dkt. No. 185.  Class Members' reaction to the Settlement has been overwhelmingly positive: Notice of the Settlement was mailed to 2,016 individuals; to date, over 76% of the Class has submitted claims to collect 85% of the Settlement Fund.  Only three Class Members have filed formal objections. This response confirms Class Counsel's view that the Settlement is in the best interests of the Class, and underscores the correctness of the Court's initial determination that the Settlement is fair and reasonable, and one which adequately protects the interests of the Class Members.  Plaintiffs respectfully request that the Court grant final approval of the Settlement, final certification of the Meal and Rest Period Settlement Subclass, and Plaintiffs motion for an award of attorneys' fees and costs, and class representative incentive awards.

## II.   FACTUAL & PROCEDURAL BACKGROUND

Defendant FedEx Ground Package System, Inc. ("FXG"), and its division FedEx Home Delivery ("FHD") (hereinafter together referred to as "FXG" or "Defendant"),[1] employs thousands of drivers to pick-up and deliver packages nationwide.

As a condition of employment, each FXG Driver is required to execute a contract with FXG, known as the FedEx Ground Pickup and Delivery Contractor Operating Agreement ("OA"). The OA classifies the Drivers as independent contractors, but grants FXG substantial rights to

---

[1] FedEx Ground deals primarily with business-to-business deliveries, while FHD deals primarily with residential deliveries.  The business differences between the two divisions are not material to the litigation.

1   control the manner and means of their work.  It requires that Drivers provide daily package pick-up

2   and delivery service to FXG customers on assigned routes, wearing FXG uniforms, driving FXG-

3   branded trucks, using FXG scanners, and following FXG work methods.

4       On November 17, 2004, Plaintiffs filed the instant action, *Alexander v. FedEx Ground*

5   *Package System, Inc.*, in the California Superior Court for the County of Alameda, alleging that the

6   Drivers were employees, not independent contractors.  Declaration of Beth Ross in Support of

7   Preliminary Approval of Class Action Settlement, Dkt. No. 149, ¶ 3.  In their Third Amended

8   Complaint, filed October 1, 2007, Plaintiffs asserted damage claims under the Family Medical

9   Leave Act, 29 U.S.C. § 2617(a)(1)(b) and various provisions of the California Labor Code

10   (including, *inter alia*, claims for unreimbursed employment expenses (§2802),  unlawful wage

11   deductions (§ 221), missed meal and rest periods (§226.7), unlawful coercion (§ 450), unpaid

12   overtime (§1194)), along with a common law fraud claim, claims to collect civil penalties under

13   Labor Code §203 (waiting time) and §2699 (PAGA), and derivative claims for restitution,

14   declaratory, and injunctive relief under the California Unfair Competition Law, Business and

15   Professions Code §17200 *et. seq*.  *Id.*

16       After filing a timely answer to the complaint, FXG removed the action to Federal court.

17   Dkt. No. 149, ¶ 4; Dkt. No. 1.  In August 2005, pursuant to a motion filed by FXG, the Judicial

18   Panel on Multidistrict Litigation ("JPML") transferred *Alexander* to a multidistrict litigation

19   ("MDL") docket before Judge Robert Miller in the Northern District of Indiana.  *See In re FedEx*

20   *Ground Package System Inc. Employment Practices Litig.*, (No. II), 381 F. Supp. 2d 1380

21   (J.P.M.L. 2005).  Over 62 cases challenging FXG drivers' "independent contractor" classification

22   were eventually consolidated into the MDL docket for coordinated pretrial proceedings.  Dkt. No.

23   149, ¶ 4.  Three firms were appointed as co-lead counsel for the Plaintiffs, including Leonard

24   Carder, LLP.  Dkt. No. 149, ¶ 5; MDL Dkt. No. 52.

25       Between 2005 and 2007, the parties engaged in extensive written, document, deposition,

26   and expert discovery.  The MDL court's case management order required Plaintiffs to file class

27   certification motions in five waves after the close of class certification and merits discovery.   The

28   Plaintiffs filed the *Alexander* class certification motion on March 13, 2007, the deadline for cases

1  assigned to "wave one." Dkt No. 149, ¶ 6; MDL Doc. Nos. 58, 261, 482.  Plaintiffs moved to

2  certify a California class to assert claims for unreimbursed expenses, illegal wage deductions,

3  unlawful coercion, waiting time penalties, PAGA penalties, a nationwide class to assert claims

4  under the FMLA, and a derivative UCL claim predicated on the same statutes.  Dkt No. 149, ¶ 6.

5  The MDL Court certified those claims, adopting the following General Class definition:

> All persons who: 1) entered into an [sic] FedEx Ground or FedEx Home
> Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-
> RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for
> commonly excused employment absences) from November 17, 2000 through
> October 15, 2007 to provide package pick-up and delivery services pursuant to
> the Operating Agreement; and 3) were dispatched out of a terminal in the State
> of California.

11  *Id*; MDL Dkt. No. 1119.  The MDL also certified an Overtime Subclass– including class members

12  who drove delivery vehicles with a Gross Vehicle Weight Rating of less than 10,001 pounds –

13  which was similarly defined:

> All persons who: 1) entered into an [sic] FedEx Ground or FedEx Home
> Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-
> RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for
> commonly excused employment absences) from November 17, 2000 through
> October 15, 2007 to provide package pick-up and delivery services pursuant to
> the Operating Agreement; (3) were dispatched out of a terminal in the state of
> California, and (4) at any time during the class period operated a vehicle with a
> gross vehicle weight rating of less than 10,001 pounds.

19  *Id*.[2]  In May 2008, class notice was sent to the approximately 2,300 individuals and entities

20  identified by FXG as possibly fitting the class definition, followed by a Supplemental and Second

21  Supplemental Class Notice sent on September 21, 2009.[3]  Dkt No. 149, ¶ 7.

22      Between April and June 2008, the parties filed cross-motions for summary

23  judgment/summary adjudication on the issue of the Drivers' employment status.  Dkt. No. ¶149, ¶

24  _____

25  [2]  The MDL Court denied Plaintiffs' motion to certify the claims asserted under the FMLA on a nationwide basis.  Plaintiffs made the strategic decision to not seek class certification of the meal and rest period claims (including the derivative UCL claims) or the claim for common law fraud. Dkt. No. 149, ¶ 6, n.2.  Among other reasons, the trend in the California courts at that time – several years before the

26  California Supreme Court decided *Brinker Restaurant Corp. v. Superior Court (Hohnbaum)*, 53 Cal.4th 1004 (2012) – was *not* to certify meal and rest period claims for class adjudication.  *Id*.; Dkt. No. 126 at 9-

27  10; *see also* Order Denying Motion to Intervene, Dkt. No. 175, 9:3-15.

28  [3]  About 20 persons opted out of the *Alexander* class. Dkt. No. 149, ¶ 7; Dkt No. 149-1,Ex. A2.

1    8.  Two years later, on December 10, 2010, the MDL court issued an order that, *inter alia*, granted

2    Defendant's motion for summary judgment and denied Plaintiffs' cross motion for summary

3    adjudication, finding that the Plaintiffs and Class Members were "independent contractors" under

4    California's "right to control" employment status test.  *Id; see also* MDL Dkt. No. 2097.[4]

5           On January 24, 2011, the parties filed a Joint Proposed Pretrial Order detailing the history

6    of the prior proceedings and the remaining issues to be tried.  Dkt No. 149, ¶ 9; *see also* Dkt. No.

7    46, Ex. A. thereafter, the MDL court referred the case back to the JPML and, in late 2011, the

8    JPML remanded the *Alexander* case to this Court for resolution of the remaining FMLA claims.

9    *Id*.[5]

10          Plaintiffs appealed from the adverse judgment to the Ninth Circuit Court of Appeal.  Dkt.

11   No. 149, ¶ 11.  On August 27, 2014, the Ninth Circuit issued its opinion reversing the MDL court's

12   decision and finding the Drivers to be employees as a matter of law under California's right-to-

13   control test.  *Alexander v. FedEx Ground Package Systems, Inc.*, 756 F.3d 981 (9th Cir. 2014).

14          Shortly after remand from the Ninth Circuit in October 2014, the parties began to meet and

15   confer extensively to develop a joint pretrial and discovery plan.  Dkt. No. 149, ¶ 12.  They

16   exchanged electronic records and documents pertaining to Plaintiffs' class-wide damage claims

17   and Defendant's various defenses to liability and commenced intensive motion practice with

18   respect to the disputed legal and factual issues.  *See* Dkt. Nos. 88, 94, and 102.  On May 21, 2015,

19   Defendant filed three motions pertaining to its key defenses, including (1) a motion to clarify the

20   class definition intended to vastly reduce the size and scope of the class, (2) a motion to limit

21   Plaintiffs' recoverable damages by shortening the length of the damage period, (3) a motion to

22   exclude settlement deductions from Plaintiffs' damages directed at the viability of Plaintiffs'

23   claims to recover damages for certain categories of settlement deductions.  *See* Dkt. Nos. 109-113.

24   Both before and after these motions were filed, the parties engaged in numerous in-person and

25   telephonic meetings in an effort to narrow the disputed legal and factual issues and to move the

26

27   _____

       [4] The MDL Court issued no ruling with regard to Plaintiffs' FMLA claim.  Dkt. No. 139, ¶ 8.

28       [5] In 2012, the parties settled the FMLA claims and the court entered final judgment in FXG's favor.
     Dkt. No. 149, ¶ 10.

1    litigation forward efficiently and expeditiously. *Id.*

2         In April 2015, the parties began formal settlement discussions.  Dkt. No. 149, ¶ 13.  In

3    preparation for mediation, FXG provided Plaintiffs with additional voluminous class-wide data,

4    spanning 15 years, from multiple sources and electronic record-keeping systems to enable

5    Plaintiffs to value the class damage claims.  *Id.* The data includes but is not limited to electronic

6    scanner and settlement data showing the Drivers' mileage and work hours, settlement payments,

7    deductions, and adjustments, route ownership, vehicle records, and dates of service.  *Id.*  Plaintiffs

8    engaged a forensic accounting expert who spent many dozens of hours reviewing and analyzing

9    FXG's extensive electronic records; Plaintiffs simultaneously undertook a painstaking review of

10   the voluminous receipts and other records produced by the Named Plaintiffs documenting their

11   damage claims.  *Id.*  After many weeks of cooperation between the parties and comprehensive

12   analysis of the complex data produced by Defendant, Plaintiffs' expert generated a detailed

13   damage-exposure model and risk analysis.  *Id.*

14        The parties selected Michael Dickstein, a highly respected and skilled mediator with special

15   expertise in complex employment matters.  Dkt No. 149, ¶ 14.  In advance of the mediation, the

16   parties exchanged comprehensive mediation briefs with each other and the mediator that included

17   their respective analyses of Defendant's pending motions, the strengths and weaknesses of all

18   claims and defenses, and the other potential litigation risks facing both sides.  *Id.*

19        All parties attended two full days of mediation on June 2 and 3, 2015, including four of the

20   seventeen Named Plaintiffs on the first day.  Dkt. No. 149, ¶ 15.  The parties entered into a

21   Memorandum of Understanding at the end of the second day, which was the basis for the

22   Settlement Agreement presented for the Court's approval at the hearing held on August 6, 2015. *Id.*

23   Following that hearing, the parties engaged in further negotiations over the settlement terms, with

24   the assistance of the mediator, in light of concerns raised by the Court about the scope of the

25   proposed release and other aspects of the tentative agreement.  Dkt No. 149, ¶ 16.

26        On August 20, 2015, the parties filed a Joint Submission notifying the Court that they were

27   in the process of renegotiating the settlement terms in several material respects, including the

28   parties' intent to move to certify a settlement subclass comprised of *Alexander* class members who

1   have continued to contract with and drive for FXG during the last four years (between August 1,

2   2011 and August 31, 2015) in exchange for the release of potential claims they may possess for

3   alleged missed meal and rest periods (for the same time period) under California Labor Code

4   Sections 226.7, 510 and IWC Order 9, as well as derivative claims under the UCL.   Dkt. No. 134;

5   *see also* Dkt. No. 149, ¶ 17.  The next day, Henrik Zohrabians filed an Ex Parte Motion to

6   Intervene. Dkt. No. 135.

7        On September 3, 2015, the Court heard argument on the Motion to Intervene.  On

8   September 11, 2015, the parties filed a joint stipulation to file a Fourth Amended Complaint

9   brought by *Alexander* class member Marjorie Pontarolo on behalf of a settlement subclass of all

10  similarly situated *Alexander* Class Members, as defined above.  Dkt. Nos. 146, 146-1.  On

11  September 15, 2015, Plaintiffs filed their motion for preliminary approval.  Dkt. No. 148.  Two

12  days later, Plaintiffs and Defendant filed oppositions to Zohrabians' Motion to Intervene; the Court

13  denied Zohrabians' Motion in an order entered September 29, 2015.  Dkt. Nos. 148, 168, 170, 175.

14       The Court granted preliminary approval of the Settlement on October 22, 2015.  Dkt. No.

15  179.  Plaintiffs filed their Motion for Award of Attorneys' Fees and Costs and Class Representative

16  Service Payments on November 13, 2015.  Dkt. No. 185.

17  **III.    TERMS OF THE SETTLEMENT**

18       The details of the Settlement are set forth in the Settlement Agreement submitted with the

19  Plaintiffs' Motion for Preliminary Approval.  Dkt. No. 149-1, Ex. 1.  In brief, the parties negotiated

20  a $226,500,000 cash settlement on behalf of the 2,016 Class Members.  The settlement sum is

21  inclusive of payments to the Class, attorneys' fees, service awards to class representatives,

22  payments to the state for PAGA penalties, and settlement administration costs.  *Id.*  There is no

23  reversion to Defendant.

24       **A.  The Class Membership and Recovery Periods**

25       The Settlement includes: (1) the General Class including all Drivers in California who

26  entered into an Operating Agreement ("OA"), drove full-time for FXG and were dispatched from a

27  terminal in California between November 17, 2000 and October 15, 2007; (2) the Overtime

28  Subclass including all eligible General Class Members who operated a vehicle with a gross vehicle

weight rating of less than 10,001 pounds; and (3) the provisionally certified Meal and Rest Period Settlement Subclass including all eligible General Class Members who were dispatched out a terminal between August 1, 2011 and August 31, 2015.

The "Recovery Period" refers to the time period for which Class Members are eligible for a settlement payment.  The Recovery Period for each eligible General Class and Overtime Subclass Member extends from the beginning of the Class Membership Period, November 17, 2000, through August 31, 2015.  Dkt. No. 149, ¶ 23. The scope of the release applicable to these claims is governed by the same time period.  *Id.*  The Recovery Period for the Meal and Rest Period Settlement Subclass is from August 1, 2011 through August 31, 2015, and the scope of the release of claims premised on the meal and rest period allegations is governed by this more limited time period.  *Id.*

**B.  <u>Monetary Relief to Class Members</u>**

To participate in the $226,500,000 non-reversionary cash settlement, the Settlement requires Class Members to submit a claim form for payment.  Dkt. No. 149-1.  Notice was provided to each Class Member as to the estimated amount of his or her settlement payment, determined based on the best available records maintained by FXG, from which each Class Members' work weeks, and driving hours in each of those weeks, were derived. Dkt. No. 149, ¶ 42. The distribution formula is as follows:

<u>General Class Distribution Formula by Workweek</u>:  All Class Members are eligible to receive a settlement payment for each workweek during which it appears, from FXG records, that they drove one of their FXG routes 35 or more hours.  Dkt. No. 149, ¶ 44.  Class Members are also eligible for tiered flat-rate settlement payments of either $75.00 or $25.00 for workweeks during which they personally drove fewer than 35, or fewer than 25 hours (respectively).  Persons who received notice of the class action in 2009, but who, according to FXG records, did not appear to drive personally during the claim period are eligible for a flat minimum settlement payment of $250.  *Id*.

The estimated *base* weekly settlement payment is $240 for Class Members who drove in the FedEx Ground division and $190 for those who drove in the FHD division.  Dkt. No. 149, ¶ 45.

The lower FedEx Home Delivery base weekly settlement payment reflects the proportionally lower expenses incurred by Class Members who drove for FHD, who were subject to fewer and smaller wage deductions, and who operated fewer routes and smaller trucks than their counterparts in the FedEx Ground division.  *Id.*  The base weekly settlement payment for each year has been adjusted using an interest multiplier to account for statutory interest accrued at 10% simple as provided for in Labor Code Section 2802(b) during the 15 year claim period.   For example, the adjusted base weekly settlement payment for workweeks in 2005 will be two-times the unadjusted base weekly settlement payment to account for ten years of statutory interest accrued at 10%, while payments for workweeks in 2015 will be calculated using the base rate settlement payment with no adjustment.  *Id.*

Overtime Subclass Distribution Formula:  Settlement payments to Overtime Subclass Members have been allocated *pro rata* from an overtime fund of $16,000,000.  These payments are based on number of overtime hours (i.e. hours over 8 hours in a day or over 40 in a week) reflected in FXG's scanner records logged by each eligible subclass member relative to the total number of overtime hours logged by all members of the Overtime Subclass.  Dkt. No. 149, ¶ 46.

Plaintiffs determined, based on identifying information provided by FXG, that approximately 20% of the vehicles operated by Class Members during the class period had a gross vehicle weight rating of less than 10,001 pounds.  Dkt. No. 149, ¶ 46.   Plaintiffs' expert then used FXG scanner data to calculate the actual number of overtime hours driven Class Members in the eligible vehicles.  *Id.*  Plaintiffs' expert multiplied that by an average regular hourly rate of pay of $28.00, which he developed based on a sample of Drivers' actual settlement checks and pursuant to the Labor Code's formula.  *Id.*  This calculation valued the overtime claims at approximately $16,000,000, exclusive of statutory interest accrued on those claims.  *Id.*  The settlement allocates 50% of the overtime recovery to unpaid wages and 50% to accrued interest.  The $16,000,000 figure will allow Overtime Subclass Members to recover approximately $14.00 in overtime premiums (based on an average regular hourly rate of pay of $28.00) for each overtime hour they drove as indicated in FedEx Ground's records for which they received straight-time compensation but not overtime premiums.  *Id.*

1        <u>Meal and Rest Period Settlement Subclass Distribution Formula</u>:  The Meal and Rest Period

2 Settlement Subclass settlements have been allocated *pro rata* to the approximately 468 class

3 members who FXG records show continued to contract with FXG, and personally drive during the

4 last four years (between August 1, 2011 and August 31, 2015) from the meal and rest period fund

5 of $5,600,000.  Dkt. No. 149, ¶ 48. These payments are based on the number of days driven by

6 each eligible subclass member, as reflected in FXG's records, relative to the total number of days

7 driven all members of the Meal and Rest Period Settlement Subclass during the period August 1,

8 2011 through August 31, 2015.

9        The distribution methodology applied here – which is rooted in a workweek model - is

10 commonly employed in wage-and-hour cases.  *See, e.g., Ching v. Siemens Industry, Inc.*, No. C 11-

11 4838 MEJ, at *6 (N.D. Ca. Nov. 26, 2013) (granting preliminary approval of settlement and

12 finding that weeks-worked was a reasonable basis for allocating individual payments).

13     **C.  <u>Settlement Administrator and Class Notice</u>**

14        The Settlement designated Rust Consulting as the Settlement Administrator, and required

15 Rust to send Notice Packages by First Class mail to the last known address of each Class Member.

16 The Settlement provides that the Notice Package would include a copy of the Class and Settlement

17 Notice approved by the Court and a Claim Form setting forth the estimated settlement calculation

18 for the particular Class Member, a description of how that amount was calculated, and information

19 about how to dispute the individual settlement amount.  Dkt. No. 149-1, Ex. 1, pp. 9-10.

20        The Class and Settlement Notice and Claim Form approved by the Court informs Class

21 Members of all material terms of the Settlement, including the procedures for objecting to the

22 Settlement, requesting exclusion from the Settlement when permitted, and challenging information

23 regarding the Class Members' dates, weeks, and hours worked on the Claim Form.  Dkt. No. 149-

24 2, Exs. B-E.  To be timely, Objections to the Settlement, Challenges to the Payment Calculations,

25 and Requests for Exclusion had to bear a postmark no later than February 15, 2016.  Dkt. No. 193.[6]

26

27        [6]  The parties have agreed, subject to the Court's approval, to honor late-filed claims. Ross

28 Decl., ¶ 7.

## IV.    NOTICE PROCESS, OBJECTIONS AND EXCLUSIONS

On about November 4, 2015, Rust received from the Parties a computerized list of 2,016 distinct names and addresses, characterized as the Class List.  Myette Decl., ¶ 8.  Rust caused the addresses in the Class List to be updated using the National Change of Address (NCOA) system, which updates addresses for all people who filed a change of address with the U.S. Postal Service.  Myette Decl., ¶ 9.[7]

On November 16, 2015, Rust mailed 2,016 Notice Packets by First Class mail.  Myette Decl., ¶ 10.  With Court permission, Notice Packets were re-mailed to the entire class list on December 14, 2015, after the Parties discovered a technical problem with the first mailing list supplied to Rust.  Myette Decl., ¶ 11; *see also* Dkt. No. 184.  As of March 2, 2016, 139 Notice Packets were returned as undeliverable.  Myette Decl., ¶ 12.  Rust performed address traces for all 139 addresses and was able to find updated address for 98 Class Members, to which Rust promptly re-mailed Notice.  *Id.* Of the remaining 41 addresses, Rust was able to obtain updated information for all but three (3) addresses.  *Id.*

Additionally, Rust provided regular updates to the parties during the notice period as to the numbers of claims filed and its efforts to locate missing Class Members.  During January 2016, Class Counsel assigned staff to locate and contact Class Members who had not yet filed claim forms to ensure they had received notice, to remind them of the Court's deadlines, and to assist them with the process.   Declaration of Beth A. Ross in Support of Final Approval of Class Action Settlement and Certification of Settlement Class ("Ross Decl."), ¶ 5 (filed herewith).  Positive contact was made with approximately 273 Class Members who had not yet filed claims.  *Id.*

As of March 2, 2016, Rust has received 1,531 claim forms.  Myette Decl., ¶ 14.  Rust has received zero (0) requests for exclusion from the Settlement and approximately 66 disputes.  *Id.* ¶ 16, 18.  Three formal objections have been filed with the Court.  *See* Dkt. Nos. 196, 198, 203.

//

//

---

[7]    The Class List – generated by Defendant in 2009 – had been previously updated using the NCOA system in 2014 and with contact information received directly from Class Members over the years.

1    **V.     ARGUMENT**

2        **A.  <u>The Settlement Meets the Criteria for Final Approval</u>**

3            Courts strongly favor settlement, particularly in complex class actions.  *Class Plaintiffs v.*

4    *City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992); *see also Churchill Vill., LLC. v. Gen. Elec.*,

5    361 F.3d 566, 576 (9th Cir. 2004).  It is within the trial court's sound discretion to approve

6    settlements in class action cases.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

7    In determining final approval, the court's inquiry under Federal Rule of Civil Procedure Rule 23(e)

8    is whether the settlement is "fair, adequate, and reasonable."  FED. R. CIV. P. 23(e) (2).  A class

9    action settlement meets this standard when "the interests of the class are better served by the

10   settlement than by further litigation."  Manual for Complex Litigation (Fourth) § 21.61 (2004).

11   Courts generally will not intrude into the private consensual agreement negotiated between the

12   parties except to ensure that the settlement "is not the product of fraud or overreaching by, or

13   collusion between, the negotiating parties."  *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08

14   1365, 2010 WL 1687832, at *8 (N.D. Cal. Apr. 22, 2010) (Wilken, J.) (citing *Officers for Justice v.*

15   *Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir.1982)).

16           In deciding whether a class action settlement is fair, adequate and reasonable, courts in the

17   Ninth Circuit consider the following factors:  (1) the strength of the Plaintiff's case; (2) the risk,

18   expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class

19   action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

20   completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the

21   presence of a governmental participant; and (8) the reaction of the class members to the proposed

22   settlement.  *Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 963 (9th Cir. 2009) (overruled on other

23   grounds).  In this case, every one of the factors weighs heavily in favor of final approval:  the

24   benefit to the class of the considerable non-reversionary financial recovery of $226,500,000 far

25   outweighs the risks, costs, and further delays that would attend continued class litigation in this

26   decade old case.

27   //

28   //

1
2

**B.** **The Settlement is Fair Given the Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation.**

3

Courts assess the likelihood of success not by a particular formula, but instead by "delicate

4

balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625.  Rather

5

than reaching any conclusions on the contested legal and factual issues, a court may "presume that

6

through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement

7

by considering Plaintiff's likelihood of recovery." *Garner,* 2010 WL 1687832 at *9 (citing

8

*Rodriguez*, 563 F.3d at 965).

9

The first, second, and third factors all support final approval of this Settlement.  Although

10

Plaintiffs believe they would ultimately prevail if this case went to trial, they recognize the very

11

substantial risks associated with further litigation.  *See* Dkt No. 148, pp. 13-18; Dkt. No. 149, ¶¶

12

32-40.  While Plaintiffs have strong claims for liability flowing from the Ninth Circuit's finding on

13

employment status, Defendants asserted or intended to assert numerous factual and legal defenses

14

to the continuing viability of the class certification and the nature and extent of liability.  Such

15

defenses posed the risk of eliminating from the Class and Subclasses all Drivers who did not work

16

regular enough hours to be considered "full-time" drivers under the restrictive definition of the

17

phrase the Defendant urged the Court to adopt, as well as all Class Members who incorporated

18

their businesses and ceased contracting with Defendant as individuals after October 15, 2007.  *Id.*

19

FXG also sought to cut off Class Members' ability to recover damages for the earliest part of the

20

class period (2000-2004), asserting it would be unmanageable to evaluate FXG's records for that

21

period, and also for the latest part of the class period based on allegations that changes to the OA in

22

2010 ended liability under the Ninth Circuit's decision.  *Id.*  FXG's other defenses threatened Class

23

Members' potential recovery on the basis that Plaintiffs' wage deduction claim is limited under the

24

Truth-in-Leasing regulations and that Plaintiffs should be required to prove their vehicle related

25

damages (i.e. depreciation, fuel, and maintenance) using receipts-based proof (the method required

26

by the trial court in the predecessor *Estrada* litigation which resulted in smaller damages than a

27

mileage proxy) instead of a mileage proxy modeled after the IRS reimbursement rate.  *Id.*  Without

28

conceding that any adverse rulings would have been justified, Plaintiffs recognize the risk of such

1   outcomes.  This Settlement permits the Class to avoid those substantial risks that, if realized, might

2   have reduced the class recovery by 50% of more and ensures that Class Members receive

3   substantial financial benefits for the maximum Recovery Period.

4         **1.  The Settlement Consideration and Allocation Are Fair**

5         The Settlement is, as the Court has already noted, "'fair, reasonable, and adequate'" and

6   "adequately protects the interests" of the Settlement Class Members. Dkt. No. 179 at 2:13-15.  The

7   net cash settlement amount to be paid to Class Members (after payment of Class Counsel fees and

8   expenses, settlement administration costs, and Plaintiffs' service awards, if approved) will be

9   approximately $173 million dollars, a fund sufficient to pay Class Members between 42% and 57%

10  of the maximum value of their claims.[8]  The Settlement is non-reversionary and the full amount

11  should be distributed to the Class.  The average Class Member payout to the Class Members who

12  have filed claims will be approximately $113,000.  Myette Decl. ¶ 15.  More than 250 Class

13  Members will receive settlement awards over $200,000.  *Id.*  And three (3) Class Members will

14  receive settlement payments of more than $400,000.  *Id.*

15        Standing alone, the cash amount of the settlement is fair, adequate and reasonable given the

16  risks of continued litigation. *Cf. In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 459 (9th Cir.

17  2000) (finding a recovery of one-sixth of the potential recovery to be fair under the circumstances);

18  *Mojica v. Compass Group*, 13-cv-1754 (ECF No. 38) (C.D. Cal. March 14, 2014) (preliminary

19  approval to a $5 million settlement for 22,000 Compass Group food service employees, with a net

20  settlement fund of $3,175,834, and with only a 25% guaranteed pay-out to claimants ($793,958.50)

21  for 1.6 million workweeks)); *Scott v. Bimbo Bakeries USA*, No. 2:10 cv 03154 (ECF No. 174)

22  (E.D. Pa. March 5, 2014) (approving settlement of wage and hour claims alleging independent

23  contractor misclassification for payments of $900 to each current driver and $450 to each former

24  driver); *O'Sullivan v. AMN Services, Inc.*, 12-cv-2125 (ECF No. 92) (N.D. Cal. Feb. 7, 2014)

25  (Spero, M.J.) ($3 million for a class of 11,685 people – total exposure estimated for the case was

26  $108 million, before penalties and interest); *Ma v. Covidien Holding, Inc.*, No. SACV 12–02161–

27        [8] Plaintiffs' expert calculated Defendants' maximum exposure to the Class to be $533,000,000 if the
section 2802 damages were calculated a multiple of 1.6 times the IRS reimbursement rate, and
$413,600,000 using the true IRS rate.  *See* Dkt. No. 149, ¶¶ 19, 27, 31.

28

NTC & MPA ISO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS   CASE NO. 3:14-CV-3011 JD
ACTION SETTLEMENT

1   DOC (RNBx), 2014 WL 360196, at *2, 5 (C.D. Cal. Jan. 31, 2014) (finding that settlement

2   providing "9.1% of the total value of the action [was] 'within the range of reasonableness'"); *Tijero*

3   *v. Aaron Brothers, Inc.*, No. C 10-01089-SBA, 2013 WL 6700102 at *3 (N.D. Cal. Dec. 19, 2013)

4   (granting preliminary approval of settlement of wage and hour claims where the average recovery

5   would be between approximately $28 and $45); *Bautista v. Harvest Management Sub*, No. 2:12-cv-

6   10004 (ECF No. 60) (C.D. Cal. Oct. 16, 2013) (preliminarily approving a $2.2 million settlement

7   of wage-and-hour violation claims of 14,000-member class); *Balderas v. Massage Envy*

8   *Franchising, LLC,* Case No. 12–cv–06327 NC, 2014 WL 3610945, *5 (N.D.Cal., July 21, 2014)

9   (approving settlement where gross settlement amount "represents roughly eight percent of the

10  maximum recovery").

11         Finally, the plan of allocation is fair and reasonable. The Settlement provides that the

12  settlement funds shall be of allocated based on the best available records from which to estimate

13  the number of weeks and hours Class and Subclass Members worked during the Recovery Period,

14  which is the most precise allocation methodology possible here.

15         **2.   The Settlement Reflects the Informed Views of Experienced Counsel and Is the**
          **Product of Serious, Arms-Length Negotiations Conducted After Extensive**
16         **Discovery and Investigation**

17         The fifth and sixth factors—the informed views of counsel and the formal and informal

18  discovery conducted an investigation to date in the litigation—also fully support final approval

19  Class Counsel's extensive case work over the past decade demonstrates beyond doubt that they had

20  more than a "good grasp on the merits of their case before settlement talks began." *Rodriguez*, 563

21  F.3d at 967 (finding experience of counsel and stage of proceedings weighed in favor of affirming

22  district court's approval of settlement).  Through filing the attorney fee motion on November 13,

23  2015, the Leonard Carder firm had spent over 28,000 hours investigating, preparing for, and

24  participating in litigation, mediation and subsequent negotiations, as well as preparing the

25  pleadings and approval papers in this case.[9]  Under these circumstances, Class Counsel's

26  assessment that the Settlement is fair, adequate, and reasonable is worthy of deference.  *Nat'l Rural*

27         [9]  The 28,222.9 hours devoted by Leonard Carder to the litigation before, during and after the MDL,
28  through November 2015, are documented in the Declaration of Beth A. Ross in Support of Plaintiffs'
     Motion for Attorneys' Fees and Cost Ex. B, Table 1 (Dkt. No. 186-3),  Ex. D, Table 2 (186-4).

1   *Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is

2   accorded to the recommendation of counsel, who are most closely acquainted with the facts of the

3   underlying litigation.").

4        **3.   The Reaction of the Class Supports Approval**

5        "It is established that the absence of a large number of objections to a proposed class action

6   settlement raises a strong presumption that the terms of a proposed class settlement action are

7   favorable to the class members."  *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1043

8   (N.D. Cal. 2008) (citing *Nat'l Rural Telecomms. Co7op.*, 221 F.R.D. at 528–29).  As described

9   above, pursuant to the Court's preliminary approval order, the Settlement Administrator mailed the

10  Notice Packets to all Class Members identified through the data provided to Rust.  The deadline to

11  object to the Settlement was February 15, 2016.  To date, the Settlement Administrator has

12  received no requests for exclusion.  Myette Decl. ¶ 18.   Three formal objections to the settlement

13  have been presented to the Court.  *See* Dkt. Nos. 196, 198, 203.

14       Given the size of the Class, this minimal opposition confirms the correctness of this Court's

15  preliminary determination that the Settlement is fair, reasonable, and adequate and should be given

16  final approval by the Court.  *Barcia v. Contain–A–Way, Inc.*, No. 07cv938, 2009 WL 587844, at *4

17  (S.D. Cal. 2009) (absence of objectors "strongly supports the fairness, reasonableness, and

18  adequacy of the settlement").[10]

19       **4.   The Court Should Overrule the Formal Objections Filed by Marin Marquez,**
20            **Rafick El-Hani, and Henrik Zohrabians**

21       Three Class Members−Marin Marquez, Rafick El-Hani, and Henrik Zohrabians − have

22  filed objections to various procedural and substantive aspects of the Settlement[11] including: (a)

23

24       [10] No governmental agency has objected to the Settlement.  Because this case was removed to this
    Court under Class Action Fairness Act (CAFA), Defendants provided notice of the Settlement to the United
25  States Attorney General and the Attorney General of California.  Courts have noted that "[a]lthough CAFA
    does not create an affirmative duty for either state or federal officials to take any action in response to a
26  class action settlement, CAFA presumes that once put on notice, state or federal officials will raise any
    concerns they may have during the normal course of the class action settlement procedures."  *Garner v.*
27  *State Farm Mutual Auto. Ins. Co.*, 2010 WL 1687832 at *14 (N.D. Cal. Apr. 22, 2010).

28       [11] Three other Class Members also filed letters with the Court indicating their intention to appear at
    the hearing, but did not include objections.  See Dkt. Nos. 199 - 203.

Marquez objects to being excluded from the Overtime Subclass; (b) El-Hani objects to the scope of the release; (c) Zohrabians and El-Hani object to the use of claim forms; (d) Zohrabians objects to the opt-out procedure and Notice's deadline for filing objections; (e) Zohrabians objects to the maximum exposure analysis conducted by Plaintiffs; (f) Zohrabians objects to the amount of the settlement; (g) Zohrabians objects to the adequacy of the class representatives; (h) Zohrabians objects that there is a conflict between the certified and uncertified classes; (i) Zohrabians objects to the adequacy of Class Counsel; (j) Zohrabians and El-Hani object to the "clear-sailing" attorneys' fee provision; and (k) El-Hani objects to the amount of the attorneys' fees requested by Class Counsel.  Each objection should be rejected for the reasons set forth below.

> a. *Trucks with a Gross Vehicle Weight Rating of 10,001 Pounds or More Do Not Qualify For the Overtime Subclass (Marquez)*

Marquez objects to the fact that he does not qualify for the Overtime Subclass. Dkt. No. 203.  This objection is not well taken, Marquez and others like him were properly excluded from the overtime Subclass because Drivers who operated vehicles with a Gross Vehicle Weight Rating ("GVWR") of 10,000 pounds or more are exempt from California's overtime laws, even if deemed employees.  See IWC Wage Order 9-2001;  349 U.S.C. § 31132.  Plaintiffs appropriately limited their definition of the Overtime Subclass to only include Drivers of vehicles with a GVWR less than 10,000 lbs, in accordance with the exemption codified in the Motor Carrier Act and California law.  *Id.*; Dkt. No. 149, ¶ 6.  In his objection, Marquez does not dispute that he owned and operated trucks that weighed 80,000 pounds. *See* Dkt. No. 203.  Because he does not qualify for the Overtime Subclass, the objection should be overruled.

> b. *The Settlement Does Not Release Claims of Non-Class Member Secondary Drivers' Against FXG; Class Members Do Not "Supplant" FXG For Liability (El-Hani)*

El-Hani objects that the Settlement somehow releases the claims of certain non-Class Members – referred to as "secondary drivers'" — against FXG, leaving Class Members "exposed" to claims brought by the secondary drivers.  *See* Dkt. No. 196, 3:21-4:23.  But these secondary drivers – that is drivers who were employed by Class Members (like El-Hani) to service their routes but were non-signatories to any OA – are not implicated in any manner by this Settlement

1    and have not released any claims.

2           The class definition – in both the litigation and Settlement — is limited to "persons who []

3    entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement" and does not

4    include the employees of Class Members.  The release is co-extensive with the class claims in this

5    case.  Dkt. No. 149, ¶ 6, 23.  Accordingly, the Settlement does not purport to, nor could it, release

6    the claims of secondary drivers against FXG.  Thus, there is no basis to El-Hani's claim that, by

7    virtue of this non-existent release, Class Members somehow "supplant" FedEx as to liability to

8    secondary drivers.  *See* Dkt. No. 195, 3:21-23.

9           El-Hani further claims that the Notice is misleading because it is "silent" as to the fact that

10   "Class members are now exposed to the very claims they have brought against FedEx."  Dkt. No.

11   195 at 4:1-4.  It is not misleading.  The Notice properly does not address claims and issues that are

12   outside the scope of this litigation.

13          Because the claims of non-Class Member secondary drivers are not relevant to this

14   litigation and *not* released, El-Hani's objection should be overruled.

15                  c.   *The Claim Form is Justified Under the Circumstances and Did Not Depress*
16                       *Claims Rate (Zohrabians and El –Hani)*

17          Zohrabians and El-Hani object to the Settlement because Class Members were required to

18   submit claim forms to recover; they speculate that the procedure will "stymie" or "depress" claim

19   rates.  Dkt. No. 196, 5:4-22; Dkt. No. 198:14-25.  This objection should be overruled because the

20   claims-made procedure was well justified here and the significant participation rate (claims filed by

21   76% of eligible Class Members to recover 85% of settlement fund) confirms that the objectors'

22   concerns are not well founded.[12]

23          The parties agreed to a claims procedure because it was the most effective way to ensure

24   that the very substantial settlement payments will reach the recipients for whom they are intended.

25   First, the claims forms have been used, in part, to confirm the current address of hundreds of Class

26   Members who have worked for FXG over the last 15 years.  Because the address list used for the

27   _____

28          [12] El–Hani's objection was filed on January 10, 2016, but as of today he has not filed a claim for his
     settlement payment.

1   Notice mailing was almost 7 years old, neither Plaintiffs nor FXG was comfortable simply sending

2   checks of substantial sums (the *average* recovery payable to class members who have filed claims

3   will be $113,000) to a large number of unconfirmed addresses. The parties therefore opted to use a

4   claims process to ensure that checks were not blindly sent to outdated addresses, where they could

5   either be lost or fraudulently cashed to the detriment of the Class Members.  Ross Decl. ¶ 2.

6   Unlike in the cases cited by Zohrabians, the Settlement here is *non*-reversionary and unclaimed

7   funds do not return to FXG, so the parties have no incentive to discourage claims.  *Cf. Sylvester v.

8   Cigna Corp*., 369 F. Supp. 2d 34, 52 (D. Me. 2005) (denying final approval of settlement that

9   capped recovery at $51.97 per class member based on an assumed 100% class rate, but which

10   resulted in only 19.6% claims made, with a 36% payment to Class Counsel and 48% reversion to

11   Defendant) (cited by Zohrabians).[13]

12         Second, the claims process has enabled Plaintiffs' counsel to identify Class Members with

13   outdated addresses, investigate their current whereabouts, and in many cases locate Class Members

14   who otherwise would never have received their settlement payment.  This is because Plaintiffs'

15   counsel received regular reports from the Settlement Administrator regarding which Class

16   Members had not yet returned claim forms, which helped counsel focus their efforts on reaching

17   out to missing Class Members who had been lost or who had otherwise not filed their claim.

18   Plaintiffs' counsel invested significant time using the claims process to ensure that we had accurate

19   contract information for as many Class Members as possible, that Class Members properly

20   received the Notice Packet, and ultimately, their settlement awards.  Ross Decl ¶ 3.   Thus, contrary

21   to the objectors' unsupported assertion that the claims process could depress the claim rate, here it

22   was designed to *maximize* participation and to ensure that Class Members will receive their

23   recoveries.

24         Moreover, claims-made procedures are common in employment cases and the actual claims

25   rate in this case –as noted, approximately 76% of the eligible class members have filed claims to

26   recover 85% of the settlement fund  – is at the very high end of rates at which district courts

27   ────────────

28   [13] The only other case cited by objector is likewise distinguishable.  *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 391 (C.D. Cal. 2007) (denying *preliminary* approval of settlement that would provide class members with a free credit report and "up to $450").

1    regularly grant final approval. *See, e.g.*, *Barbosa v. MediCredit, Inc.*, 2015 WL 1966911 (C.D. Cal.

2    May 1, 2015) (granting final approval in wage and hour class action with 41.9% claims rate); *La*

3    *Fleur v. Med. Mgmt. Intern., Inc.*, 2014 WL 2967475 (C.D. Cal. June 25, 2014) (same, 69.53%

4    claims rate); *Ching v. Siemens Industry, Inc.*, 2014 WL 2926210 (N.D. Cal. June 27, 2014) (same,

5    74.04% claims rate); *Barnes v. Equinox Group, Inc.*, 2013 WL 3988804 (N.D. Cal. Aug. 2, 2013)

6    (same, 18% class members returned claims representing 42% of training sessions claimed);

7    *Sandoval v. Tharaldson Employee Mgmt., Inc.*, 2010 WL 2486346 (C.D. Cal. June 15, 2010)

8    (same, 24% claims rate); *Cicero v. DirectV, Inc.*, 2010 WL 2991486 (C.D. Cal. July 27, 2014)

9    (same, 61.9% of workweeks claimed); *Gribble v. Cool Transports, Inc.*, 2008 WL 5281665 (C.D.

10   Cal. Dec. 15, 2008) (same, 58% claim rate). Because the objectors' concern that the use of claim

11   forms could depress the claim rate in this case is unfounded, the objection of El-Hani and

12   Zohrabians' on this basis should be rejected.

13          d.   *The Opt-Out Procedure Protects Class Members Due Process; The Notice Opt-
14               Out and Objection Instructions Are Clear (Zohrabians)*

15          Objector Zohrabians asserts that the Notice's opt-out instructions and filing deadline are

16   confusing and thus "raise serious concerns about the fairness of the settlement." Dkt. No. 198,

17   9:27-11:26. This objection should be overruled because the instructions are clear and were

18   previously approved by this Court and because every member of this Class has been given an

19   opportunity to opt-out of this litigation.

20          The opt-out procedure in this case has fully protected the due process rights of all Class

21   Members. Each has had at least one opportunity to opt out of the litigation. Most Class Members,

22   including Zohrabians, were sent notice at the class certification stage in 2009 and had the

23   opportunity to request exclusion from the General and Overtime Subclass at that time. While only

24   20 people chose to opt out, Zohrabians and hundreds like him decided to remain Class Members

25   and be bound by the outcome of this litigation rather than pursue their individual claims. *See* Dkt.

26   No. 149-1, Ex A2 (2009 Opt-Out List). There were an additional 78 members of the General and

27   Overtime Subclass who were not previously identified following class certification. Those

28   individuals were afforded the opportunity to opt out now and none did. Myette Decl. ¶ 18, Dkt No.

149, ¶ 62; Dkt No. 149-2, Ex. E; *see also* Dkt. No. 182, 12:21-20:4 (Tr. Hrg. Oct. 15, 2015) (discussing opt-out procedures).  Finally, as the Meal and Rest Period Settlement Subclass was not included in the prior certification order, but instead has been conditionally certified for settlement purposes, members also have the opportunity to opt-out of that Subclass, and none have.  *See* Dkt. No. 149-1, Ex. D, pp. 1, 6. The Court-approved Notice clearly and succinctly apprises Class Members of these distinctions:

> ASK TO BE EXCLUDED from the Meal and Rest Period Settlement Subclass *(applies only if you continued to contract with FedEx Ground on or after **August 1, 2011**)*
> [. . . .]
> **<u>Can I ask to be excluded from the General Class and Overtime Subclass?</u>**
> No. Class members were sent notice and given the opportunity to exclude themselves from the General Class and Overtime Subclass in 2009. Because you already had the opportunity to opt-out, you cannot ask to exclude yourself now.

Dkt. No. 149-1, Ex. D, p. 1, 6 (emphasis in original).[14]  Objector and other Class Members' due process rights have been fully protected because all class members have had the opportunity to opt out of the litigation.  *Id.*; *cf. Lane v. Facebook, Inc.*, 696 F.3d 811, 824 (9th Cir. 2012) (noting that due process generally requires opportunity to opt-out of a proposed 23(b)(3) class settlement).

Zohrabians' second objection to the Notice focuses on his view that it was "unacceptable" for the Court to set the filing deadline on February 15, 2016, a federal holiday.  Dkt. No. 198 at 10:18-11:3.  Zohrabians offers no factual or legal basis for his speculative view that Class Members may have encountered a closed post office on February 15, 2016, and somehow "abandon[ed] the desire to lodge objections as a result."  *Id.* 10:22-28.  To the contrary, the high response rate (including claims and challenges postmarked after February 15th, which the parties have agreed to honor, *see* Ross Decl. ¶ 7) further underscores that the Notice process – including its deadline – was sound and Zohrabians' objection lacks merit.

Because the Notice clearly and succinctly apprised Class Members of their rights regarding exclusion from the Settlement and objections, the Court should overrule Zohrabians' objection on

---

[14] The language Zohrabians claims is confusing comes from the "Definitions" section of the Settlement Agreement, Dkt. No. 149-1, Ex. 1, not the Notice.

1    this basis. [15]

2            e.    *Plaintiffs Conducted a Detailed and Reasoned Maximum Exposure Analysis*
               *Allowing the Court and Class to Gauge the Reasonableness of the Settlement*
3               *(Zohrabians)*

4            Zohrabians objects that Plaintiffs have conducted "insufficient analysis" of—and failed to

5    explain—the maximum exposure to gauge the reasonableness of the Settlement amount versus total

6    possible damages.  Dkt. No. 198 at 13:12-14:11.  This is demonstrably false.  As shown both here

7    and in the preliminary approval papers, Plaintiffs' counsel's analysis was thorough and

8    comprehensive; the alternative process that Zohrabians now demands—i.e. collection and analysis

9    of the receipts and records from over 2,000 Class Members— would not only have delayed the

10   Settlement possibly for years, it also would likely have yielded a far worse result for the Class.

11           Plaintiffs' Counsel conducted an exhaustive and detailed maximum exposure analysis. Dkt.

12   No. 148  at 19-22 .  Plaintiffs requested, and FXG produced, 15 years' worth of data for all Class

13   Members that included but was not limited to: electronic scanner and settlement data showing the

14   Drivers' mileage and work hours, settlement payments, deductions, and adjustments, route

15   ownership, vehicle records, and dates of service.  Plaintiffs then engaged a forensic accounting

16   expert who has spent dozens of hours reviewing and analyzing these extensive electronic records.

17   Dkt. No. 149, ¶ 13.  Plaintiffs calculated FXG's maximum potential exposure assuming that:  (1)

18   Plaintiffs could prevail on every aspect of their damage claim, (2) Plaintiffs' could recover vehicle

19   expenses at a "best case scenario" rate of 1.6 times the applicable IRS mileage rate, (3) the Court

20   would award the full measure of civil penalties under PAGA and the Labor Code (amounting to

21   $86 million), and (4) Plaintiffs would defeat all of FXG's continued attacks on the scope of the

22   class, liability period, and available damages.  Dkt. No. 149, ¶ 19.  To calculate expense

23   reimbursement damages, Plaintiffs used an increased IRS rate designed  to capture *all* vehicle

24   expenses tied to actual miles driven, actual deductions from Class Members' settlement checks,

25

26        [15] Zohrabians re-alleges issues with the 2009 Class Action Notice and a 2014 letter sent to Class
     Members that he previously raised his unsuccessful motion to intervene prior to Preliminary Approval.  *See*
27   Dkt. No. 175 (Order Denying Zohrabians' Motion to Intervene). These communications have no impact on
     the fairness or adequacy of the Settlement Notice provided to Class Members at this stage; Zohrabians is
28   simply rehashing accusations he previously leveled against Class Counsel in service of his argument for
     inadequate representation.

1    and an estimate of additional expenses based on an analysis of the 17 Named Plaintiffs' receipts

2    and records.  *Id.* at ¶ 27.  For the Overtime Subclass, Plaintiffs calculated FXG's exposure using

3    Subclass Members' *actual* hours worked and, for the Meal and Rest Period Settlement Subclass,

4    Plaintiffs assumed a missed meal and rest period for every *actual* day worked during the liability

5    period.  *Id.* at ¶¶ 28, 29.  Zohrabians does not question or dispute these assumptions, but rather

6    ignores them entirely.  Dkt. No. 198 at 13:14-14:5; *but see* Dkt. No. 148 at 19-22 (identifying and

7    explaining Plaintiffs' exposure analysis).

8         Zohrabians suggests that Counsel "should have been able to come up with very specific

9    damages information via questionnaires, receipts for expenses, and a host of other methods –

10   including but not limited to, technological outreach readily available in this modern age."  Dkt. No.

11   198 at 14:6-11.  Despite Zohrabians' assertion to the contrary, that approach to calculating FXG's

12   maximum liability exposure would have been extremely onerous, time consuming and counter-

13   productive.  Zohrabians implies that it was Counsel's "burden" to compile and analyze the

14   individual receipts and varied records for over *2,000* Class Members, dating back to November

15   2000.  Counsel knows from experience that the process he suggests would have taken years,

16   because this same analysis took Counsel an entire year to calculate damages for *only 200* people in

17   *Estrada*.  Dkt. No. 149, ¶ 37; Ross Decl. ¶ 9.

18        Class Counsel also knew that using a receipts-based proof model could actually decrease

19   FXG's maximum exposure because many of the Class Members have not retained records of all of

20   their expenses, hours, and deliveries for the past 15 years.[16]  *See* Dkt. No. 148 at 16:3-20.  Counsel

21   conducted a cross-check of exposure using the records and receipts that the 17 Named Plaintiffs

22   had kept, and the results yielded either comparable or lower damages figures than a mileage proxy

23   of the true IRS rate of a multiplier of 1.6 times the IRS rate.  Counsel's experience in *Estrada* was

24   similar, as the trial court there limited Class Members' recovery to expenses for which they had

25   maintained itemized receipts and the damages awarded to class members were drastically reduced

26

27        [16] Zohrabians ironically advocates for the position taken by FXG that Class Members should be required to prove their out-of-pocket vehicle expenses with receipts rather than a mileage proxy if the litigation continues.  Plaintiffs analyzed the potential use of this mode of proof as a serious *risk* to the Class recovery.  Dkt. No. 148 at 16:3-20.

28

NTC & MPA ISO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS          CASE NO. 3:14-CV-3011 JD
ACTION SETTLEMENT

1 as a result.[17]  These experiences produced Counsel's good-faith belief that the mileage proxy

2 method resulted in a more favorable maximum exposure for Class Members.  Dkt. No. 149, ¶¶ 13,

3 37.

4       Because Plaintiffs conducted a transparent analysis of the maximum exposure value, as

5 detailed at Preliminary Approval, Zohrabians' objection that Plaintiffs failed to provide "sufficient

6 analysis" to evaluate the reasonableness of the Settlement should be overruled.

7            f.   *The Settlement Value is Fair in Light of the Risks Presented By FXG's Efforts to*
                 *Reduce Class Membership, Liability Period, and Recoverable Damages*

8                  *(Zohrabians)*

9       Zohrabians further objects that the Settlement offers Class Members "pennies on the dollar

10 in compensation" because the "risk was minimal" with respect to the reimbursement of vehicle

11 related expenses.  Dkt. No. 198 at 1:10-12, 14:26-15:13.  This myopic view not only ignores the

12 significant and meaningful value of the Settlement, but does not acknowledge or address the

13 exhaustive risk analysis undertaken by Plaintiffs' counsel and explained extensively in the

14 Preliminary Approval process.  *See* Dkt. No. 148 at 13:1-18:18.

15       Despite the Ninth Circuit's opinion establishing that Class Members were employees as a

16 matter of law, FXG continued to maintain that Plaintiffs could not recover reimbursement of

17 expenses for significant portions of the class membership and liability period.  *See generally* Dkt.

18 No. 148 at 13-18.  At the time of mediation, FXG had already filed motions to (1) apply a strict

19 definition of what it means to be a "full-time" driver that would have excluded approximately *half*

20 of Class Members from the case, (2) exclude all Class Members who assigned their OAs to

21 corporate entities between 2007 and 2010, which would have reduced the recoverable damages

22 period by approximately 60%, and (3) exclude all recoverable damages including reimbursement

23 of expenses since December 13, 2010 through the present (approximately one-third of the liability

24 period).  *Id.*; Dkt. No. 149, ¶¶ 25, 33, 35-36, 47; *see also* Dkt. Nos. 108, 111.  FXG also intended to

25 seek decertification of the Class for the first four years of the class period (November 2000 through

26

27          [17] In *Estrada*, Counsel discovered that only a small number of class members had comprehensive
records and, even many of them would have achieved a more complete recovery using a mileage proxy.

28 Moreover, the use of receipts-based proof led to the dismissal with prejudice of hundreds of class members
who did not respond to court-ordered discovery.  Ross Decl. ¶ 9.

NTC & MPA ISO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS       CASE NO. 3:14-CV-3011 JD
ACTION SETTLEMENT

December 2004) on the grounds that it was administratively infeasible to determine class

membership.  That defense could have reduced class wide damages by between 40% and 50%

because Class Members' claims are most heavily concentrated during this early time period and

pre-2004 damages carry the highest interest.  Dkt. No. 108, at 10, n. 7; Dkt. No. 149, ¶ 34.

Plaintiffs also recognized the risk of decreased recovery if required to use receipts-based proof to

show damages, *discussed supra*, and faced a pending motion alleging that Plaintiffs could not

recover for deductions taken from Class Members' checks.  Dkt. No. 149, ¶¶ 37-38; Dkt. No. 113.

Each of those defenses posed a significant risk to Plaintiffs' recovery for reimbursement of vehicle

expenses, as well as other damages.[18]  Plaintiffs' careful analysis indicated that loss on any one of

those defenses could cut the maximum value in half, while loss on multiple defenses could reduce

the potential recovery to less than 25% of FXG's maximum exposure.  Dkt. No. 149, ¶ 41.

Zohrabians' objection simply dismisses those risks as "minimal" without analysis or

support.  But the settlement value obtained here on behalf of the Class and Subclasses is

substantial: the Settlement provides a minimum recovery of between 42% and 57% of the

maximum value of Class Members' reimbursement and deduction claims, 50% of the maximum

value of overtime claims, and 40% of the maximum value of the released meal and rest period

claims.  Dkt. No. 149, ¶ 31.  Class Members will receive average payouts of approximately

$113,000.  *See* Myette Decl. ¶ 15.  Not only does the Settlement provide substantial compensation

to Class Members, it also avoids years of continued, hard-fought litigation in favor of settlement

payments *now* to Class Members who have already waited more than 10 years for this litigation to

conclude.  In light of the risk of continued litigation and significant benefit to the Class Members,

Zohrabians' objection to the amount of the settlement should be overruled.

g.  *The Named Plaintiffs are Adequate Representatives Who Do Not Have a Conflict With the Class (Zohrabians)*

Zohrabians objects that the Named Plaintiffs are inadequate class representatives because

they settled their individual meal and rest break claims for $1,000,000, while entering into a class

---

[18] For example, Plaintiffs also took into consideration the risk that the Court would not award the Class the full $86,000,000 in PAGA and Labor Code penalties included in the maximum exposure analysis. Dkt. No. 149, ¶ 40.

1    settlement that, according to Zohrabians, provides no compensation at all to other Class Members

2    for the same claims.  Relying on inapposite cases that examine excessive settlement enhancements

3    for class representatives, *see* cases cited at Dkt. 198 at 5-6, Zohrabians speculates that the

4    individual meal and rest break ("MRB") settlement dooms the Class Settlement because it "may"

5    have tempted the Named Representatives to accept a suboptimal settlement at the expense of the

6    class.  The objection is factually and legally deficient.

7         First, the MRB settlement of the Named Plaintiffs is *not* a settlement enhancement payable

8    to the Named Plaintiffs for their service to the class.  It is a compromise of the Named Plaintiffs'

9    individual damage claims, which were pending at the time of settlement and would need to be tried

10   if not settled.  If tried, the Named Plaintiffs could potentially have achieved greater recoveries for

11   these claims than the discounted net settlement payments they will receive, representing

12   approximately 42% of Defendants' estimated maximum liability for these claims (including

13   interest).  Dkt. No. 149, ¶ 48, n. 7.

14        Second, the terms of the Class Settlement *do not* confer any preferential treatment on the

15   Named Plaintiffs, let alone "raise the specter that the Named Plaintiffs have been compromised by

16   a monetary payout."  *Id.* at 5:2-5.  The Named Plaintiffs will participate in the class recovery on the

17   very same terms as all other Class Members, [19] and their incentives to maximize the class recovery

18   have never been compromised.  Zohrabians is grasping at straws in arguing that the Named

19   Plaintiffs stand to receive impermissible incentive payments "no different" than those rejected by

20   the Ninth Circuit in *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir.

21   2013) and *Rodriquez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009).  The prohibited

22   incentive enhancements in both cases were large sums of money that *far* exceeded what other class

23   members would be paid under the settlement terms and that the class representatives had *no*

24   possibility of achieving at trial.  *Radcliffe*, 715 F.3d at 1165 ($5000 conditional incentive awards

25

26        [19]  Plaintiffs have applied to the Court for class representative service awards for the 17 original
     Named Plaintiffs in the amount of $10,000 in recognition of their extraordinary service to the class as well
27   as a smaller settlement enhancement of $1500 for the MRB subclass representative as described in their
     declarations.  *See* Dkts. 150-167. The requested settlement enhancements were not conditioned on support
28   for the class settlement, nor are they guaranteed as it is for the Court to decide whether settlement
     enhancements are warranted here and if so the appropriate amount.

where range of class recovery as between $26 and $750); *Rodriguez,* 563 F.3d at 959-960  (sliding scale conditional incentive awards capped at $75,000 payable even in the event of suboptimal class recovery).  The Ninth Circuit correctly found that these enhancements created a direct conflict of interest between the class representatives and the absent Class Members because (1) the payments were only available to class representatives who supported the settlement and (2) represented money that they would only receive if a settlement was approved.  For this reason, the Circuit concluded the enhancements created a powerful *disincentive* for the class representatives to oppose even suboptimal settlement terms.  Stated in the simplest terms, the class representatives had something valuable to lose by rejecting any settlement, no matter the terms, instead of proceeding to trial.[20]

Unlike the class representatives in *Rodriguez* and *Radcliffe,* who had *no* incentive to go to trial and risk their incentive awards, the Named Plaintiffs interests here have at all times been fully aligned with those of the Class.  By holding out for the best possible terms at the settlement table, the Named Plaintiffs stood to maximize their own recoveries along with the Class. Their most valuable claims are those they share with the Class for unreimbursed expenses, improper wage deductions and unpaid overtime.  Like all Class Members, the Named Plaintiffs will each receive *pro rata* shares of the Class Settlement fund and, in fact, the lions' share of their settlement recoveries will come from the Class Settlement fund.  The dollar value of their expected recoveries is fully in line with those of the class and many hundreds of the 2,016 Class Members are on track to receive far higher settlement payments than the Plaintiffs, even when their individual MBR

---

[20]   The litany of other cases cited by Zohrabians also concerned excessive class representative enhancement awards and are therefore inapposite. *See, e.g. Staton v. Boeing Corp.*, 327 F.3d 938 (9th Cir. 2003) (district court abused its discretion by approving $50,000 incentive awards to 29 class representatives; noting that incentives so disproportionate to class recovery eliminate a critical check on the fairness of the settlement); *accord West v., Circle K Stores, Inc.*, 2006 WL 1652598 (E.D. Cal. 2006) (incentive awards 6 times larger than payout to absent class members' raised question about fairness of settlement); *Cruz v. SkyChefs Inc.*, 2014 WL 2089938 (N.D. Cal. 2014) (expressing concern about request for up to $15,000 incentive payment for class representatives); *Myles v. AlliedBarton Sec. Serv. LLC*, 2014 WL 6065602 (N.D. Cal. 2014) (expressing general disapproval of class representative enhancements that exceed the payouts of ordinary class members); *Stokes v. Interline Brand, Inc.*, 2014 WL 5826335 (N.D. Cal. 2014) (same); see also *Jacobs v. Cal. State Auto Ass'n. Inter-Ins. Bureau*, 2009 WL 3562871 (N.D.Cal. 2009) (rejecting request for up to $25,000 incentive payment as quite high where $5000 payment is presumptively reasonable).

1    settlement payments are taken into account.[21]  The same is true with respect to the Named

2    Plaintiffs' individual MRB claims, which were valued, discounted, and settled in the same fashion

3    as the claims of the Meal and Rest Period Settlement Subclass.  Moreover, unlike the settlement

4    enhancements in *Radcliffe* and *Rodriguez*, which provided the class representatives with substantial

5    monetary relief that they could *only* achieve by settling the class claims, the Named Plaintiffs'

6    could potentially have achieved larger recoveries at trial for their individual MRB claims.  The

7    record thus leaves no doubt that the Named Plaintiffs in this case had *every* incentive to maximize

8    the class recovery and no incentive to sell out the Class in furtherance of any different and

9    conflicting interests.

10        Third, while Mr. Zohrabians is correct that the Class Settlement provides no financial relief

11   to *Alexander* Class Members for MRB claims that accrued prior to August 2011, he is wrong to

12   suggest that the Class Settlement somehow effects a "de facto release" of those claims and is

13   objectionable for that reason.  The opposite is true.  As Zohrabians and his counsel well know, the

14   Class Settlement does not apply in any way to the pre-August 2011 MRB claims, which are

15   expressly *excluded* from the scope of the release.  Dkt. No. 149-1, Ex. 1.  The Class Members'

16   right to pursue pre-August 2011 MRB claims is made explicit in the settlement agreement,[22] as

17   well as the class Notice advising Class Members that  *"… the settlement does not apply to and does*

18   *not release claims premised on California law for missed meal and rest breaks (if any) that*

19   *accrued at any time prior to August 1, 2011."*  Dkt. 149-2, Ex. D, p. 5.  In ruling on Zohrabians'

20   motion to intervene, this Court explicitly left open the question whether the statute of limitations

21        [21]  The range of recoveries payable to the Named Plaintiffs including both their *pro rata* shares of
22   the class settlement and their individual MRB settlement payments is between approximately $37,000 and
     $295,000, while the recoveries payable to class members range between $250 and $445,000.  Ten of the
23   seventeen (17) Named Plaintiffs will receive settlements at or below the *average* estimated settlement
     payment of $113,000 and only four (4) stand to recover settlements larger than $200,000.00.  *See* Ross Decl.
24   ¶ 10; Myette Decl. ¶ 15.

25        [22]  Section I(T) – which defines the term "Released Claims" – includes the following proviso:  "It is
     expressly understood between the parties that this release of claims *does not* extend to and does not release
26   claims that are owned or held by General Class Members, Sub-Class Members, or Meal and Rest Period
     Settlement Sub-Class Members and/or by their affiliated business entities (if any), as against Releasees, or
27   any of them, for claims premised on alleged violations of California Labor Code Sections 226.7, 510 and
     IWC Wage Order 9 (if any) that accrued at any time prior to August 1, 2011, which claims were not
28   certified as class claims in this action and are not covered by this Settlement Agreement."  Dkt. No.149-1,
     Ex. 1, p. 7.

1   has been tolled for Class Members' pre-August 2011 MRB claims either under the Supreme

2   Court's *American Pipe* tolling doctrine or the equitable tolling principles articulated by the Ninth

3   Circuit in *Hatfield v. Halifax PLC*.  Moreover, the Court expressly invited Zohrabians to file a new

4   case asserting these claims.  *See* Dkt. No. 144 at 30:11-31:14 (Sept. 3, 2015 Hrg. Tr.); Dkt. No. 175

5   at 10-11 (rejecting Zohrabians' argument that he would be prejudiced if he had to pursue a pre-

6   August 2011 MRB claim in a new action).  The argument that the Settlement is unfair to the Class

7   because it does not provide relief for claims that are not part of the case and that are expressly

8   excluded from the release strains credulity.

9        There is also no merit to Zohrabians' claim that an actual or potential conflict exists

10   between the Named Plaintiffs and the class vis-à-vis the MRB claims.  The MRB class settlement

11   creates a $5.6 million dollar fund payable to a settlement subclass comprised of *Alexander* class

12   members who continued driving for Defendant after August 11, 2011 in exchange for a release of

13   their MRB claims that arose during that time period. The MRB claims of this provisionally

14   certified subclass were valued and discounted for risk according to the identical assumptions used

15   to value and discount the Named Plaintiffs' individual MRB claims.  *See* Dkt. No. 149 at ¶¶ 29, 48,

16   n. 8 (detailed description of valuation formula, discounted risk analysis, and settlement terms).  As

17   Plaintiffs have previously explained, the Named Plaintiffs and members of the Meal and Rest

18   Period Settlement Subclass will all be paid approximately 42% of the maximum calculated value of

19   these claims under the terms of both settlement agreements.  While the Settlement requires MRB

20   subclass members to release FXG of liability for MRB claims accrued during only the last four

21   years, the Named Plaintiffs have provided Defendant with the greater consideration to resolve their

22   MRB claims in the form of a broad general release and waiver of all known and unknown claims

23   pursuant to California Civil Code §1542.  Thus, vis-à-vis the MRB claims, there has been not

24   preferential treatment for the Named Plaintiffs over the Settlement Subclass.

25        Finally, and despite Zohrabians' previous – and entirely dishonest – efforts to convince this

26   court otherwise, the MDL Court did not certify a MRB claim for class adjudication.  *See* Dkt. No.

27   175.  As such, the 17 original Named Plaintiffs *do not* represent the Meal and Rest Period

28   Settlement Subclass or share in their recovery.  Rather the representative of the Meal and Rest

1    Period Settlement Subclass —Marjorie Pontarolo—will share in the MRB recovery on the exact

2    same terms as the subclass she represents.  For all of these reasons, the objection that the Named

3    Plaintiffs are inadequate representatives with conflicting interests from those of the class should be

4    overruled.

5        h.   *There is No Conflict Between Class Members and Non-Class Members*
             *(Zohrabians)*
6

7        Zohrabians objects that the Settlement is unfair because it does not provide relief for drivers

8    who signed contracts with Defendant *after* the class membership period closed on October 15,

9    2007, whom he refers to as "uncertified members of this litigation," under the MDL court's

10   certification order.  This objection is frivolous.  The Class Settlement provides relief for members

11   of the certified General Class and Overtime Subclass and the provisionally certified Meal and Rest

12   Period Settlement Subclass.  The Named Plaintiffs were appointed by the Court to represent these

13   defined classes of persons and no others.  Neither the Named Plaintiffs nor Class Counsel have any

14   right or duty to litigate or resolve claims possessed by FXG drivers who do not fit the class

15   definition and whom they never sought to represent.

16       i.   *Class Counsel Are Adequate (Zohrabians)*

17       Zohrabians also objects to the Settlement on the grounds that Class Counsel has "numerous

18   conflicts" with the Class that rendered them inadequate to negotiate a fair, adequate and reasonable

19   settlement. The objection must fail because Zohrabians has not demonstrated the existence of any

20   possible conflict of interest—actual or potential—between Class Counsel and the Class that either

21   has or could compromise Class Counsels' competence or adequacy to settle the case on the terms

22   proposed or, absent of final approval, to try the case to judgment.

23       Most importantly, Zohrabians has failed to show that Class Counsel has pursued any course

24   of action during the litigation or in the settlement process "in diametric opposition" to the interests

25   of the Class.  While his papers are prolix, his primary complaint appears to center on Class

26   Counsel's  refusal to agree with the false claim he made in support of his motion to intervene that

27   the MRB claims were somehow inadvertently certified by the MDL Court in 2007 but later

28   abandoned by Class Counsel. *See* Dkt. No. 198 at 7:17-21.  In denying Zohrabians' motion to

- 29 -

1   intervene, this Court observed that "nothing supports the chicanery suggested by Zohrabians – i.e.

2   that a MRB claim in some form was certified and that the parties have falsely represented to this

3   Court that it was not." Dkt. No.175 at 8:17-19.  Class Counsel cannot be accused of taking a

4   position adverse to the Class by truthfully apprising the Court of the procedural history of the case.

5          Zohrabians secondary complaint appears to be that Class Counsel breached their duty to the

6   Class by negotiating a "de facto" release of MRB claims that accrued prior to August 2011.  But, as

7   shown above, the exact opposite is true: the Settlement *expressly excludes* the pre-2011 MRB

8   claims from the scope of the release and leaves these claims—to the extent they are viable— intact.

9   Indeed, it was for this reason that the Court rejected Zohrabians' motion to intervene and invited

10  him to "initiate a new action to assert a pre-August 2011 MBR claim." Dkt. No. 175 at 11:5-7.

11         Zohrabians' further assertion that these "conflicts" trigger California's purported per se

12  "automatic disqualification rule" has *no* legal basis and is refuted by his own cited authorities. *See*

13  Dkt. No.198 at 9:2-13.  On remand from the Ninth Circuit in the *Radcliffe v. Experian* consumer

14  fraud litigation, district Judge Carter rejected the identical argument advanced by Zohrabians here,

15  denying a class objector's motion to disqualify the lead settling counsel.  *White v. Experian Info.*

16  *Solutions,* 2014 WL 1716154 (C.D. 2014).  Noting that the "automatic disqualification rule" relied

17  on by Zohrabians applies in cases involving concurrent representation of clients with directly

18  conflicting interests (i.e. representation of a plaintiff in one case, and a defendant in another), Judge

19  Carter observed that "California case law *does not* provide clear guidance on how courts should

20  wield the automatic disqualification rule in class action cases." *Id.* at *5.  He went on to hold that

21  the "automatic disqualification" rule was not appropriately applied in the case before him—*despite*

22  the Ninth Circuit's order rejecting the *Radcliffe* class settlement due to conflict between counsel

23  and the class—where the conflict was not "inherent" but instead rooted in the faulty settlement

24  terms, was brief, and fully extinguished when the Ninth Circuit rejected the settlement.  *Id.* Thus,

25  *even if* Zohrabians' were correct that Counsel is conflicted – *a point Plaintiffs and Class Counsel*

26  *vehemently dispute* – it would not result in automatic disqualification; Objector's renewed effort to

27  oust Class Counsel and to replace them with his chosen representative must be rejected.

28

1

2

    j.   *The "Clear Sailing" Clause Does Not Signal Collusion Where, As Here, Fees*
*Come From Common Fund (Zohrabians and El-Hani)*

3         Objectors Zohrabians and El-Hani contend the settlement is unfair and unreasonable

4 because it contains a so-called "clear sailing" clause stipulating "that the opposing party will not

5 contest a request for attorneys' fees."  Dkt. No. 196 at 2:5-3:2; *see also* Dkt. No. 198, at 12:3-13:11

6 (same).  Here, the Settlement provides that FXG will not oppose Plaintiffs' request for fees

7 equaling up to 22% of the non-reversionary common fund.  Dkt. No. 149-1, Ex. 1, p. 14.  Both

8 objectors urge the Court to subject the settlement and fee request to increased scrutiny because they

9 allege this is the sign of an "unfair deal."

10         Controlling Ninth Circuit authority holds that the presence of a "clear sailing" provision

11 "does not signal the possibility of collusion" where, as here, attorneys' fees will be awarded by the

12 Court from the same common fund as the recovery to the class.  *Rodriguez v. West Publishing*

13 *Corporation*, 563 F.3d 948, 961, n.5 (9th Cir. 2009); *see also Smith v. American Greetings Corp.*,

14 2016 WL 362395, at *7 (N.D. Cal. Jan. 29, 2016) (same); *Bayat v. Bank of the West*, 2015 WL

15 1744342, at *7 (N.D. Cal. Apr. 15, 2015) (same).

16         Ignoring this on-point authority, objectors instead rely entirely on inapposite and

17 distinguishable cases analyzing "clear sailing" provisions in the context of fee awards negotiated

18 "*separate and apart from class funds*" and/or including "kicker" clauses that cause fees which are

19 not awarded to revert back to the defendant.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d

20 935, 948 (9th Cir. 2011); *see also In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 712-713

21 (7th Cir. 2015) (it was not abuse of discretion for district court to approve separately negotiated fee

22 award with "clear sailing" provision and "kicker" clause); *Weinberger v. Great Northern Nekoosa*

23 *Corp.*, 925 F.2d 518, 520 (1st Cir. 1991) (inferring collusion from "clear sailing provision" where

24 fees to be paid separate and apart from class fund); *Gooch v. Life Investors Ins.*, 672 F.3d 402, 425

25 (6th Cir. 2012) (finding that "not every 'clear sailing' provision  demonstrates collusion;" collusion

26 in collateral state court class action settlement "particularly unlikely" in light of low percentage of

27 fees requested); Henderson W., *Clear Sailing Agreements: A Special Form of Collusion*, 77

28 TULANE L. REV. 813, 813 (2003) ("This Article argues that a clear sailing provision is often used to

1    facilitate collusive settlements in cases involving nonpecuniary relief or common funds *in which a*

2    *defendant retains a reversionary interest*.") (emphasis added).

3         The Court should overrule El-Hani and Zohrabians' objections to the Settlement's "clear

4    sailing" provision because it contemplates fees to be awarded from the same non-reversionary

5    common fund as the class recovery and therefore does not signal collusion.  *See e.g., In re High-*

6    *Tech Employee Antitrust Litig.*, 2015 WL 5158730, at *14 (N.D. Cal. Sept. 2, 2015) (overruling

7    objection to "clear sailing" provision where fees were *not* separate and apart from class funds and

8    no settlement funds could revert back to defendants); *In re Easysaver Rewards Litig.*, 921 F. Supp.

9    2d 1040, 1054 (S.D. Cal. 2013) (same).

10              k.    *Counsel's Fee Request is Appropriate and Warranted  (El-Hani)*

11        El-Hani objects that Counsels' request for attorneys' fees in the amount of 22% of the

12   common fund is excessive and would represent an "extraordinary windfall" to Plaintiffs' counsel.

13   Dkt. No. 196 at 14.  Relying on "mega-fund" cases, El-Hani argues in the abstract that Class

14   Counsel's entitlement to attorneys' fees should be evaluated under the lodestar method, but he does

15   not explain why.  Failing that, El-Hani urges the Court to conduct a lodestar cross-check if the

16   Court chooses to employ the percentage-of-the-fund method.  Dkt. No. 196 at 5:23-14:13.  Each of

17   these points is exhaustively addressed in Plaintiffs' pending fee motion, which El-Hani seems to

18   ignore in his analysis.  *See generally,* Dkt. No. 185.  For the reasons set forth in that filing, and

19   below, this objection should be overruled.

20        First, while the class settlement here is undeniably large, it cannot fairly be compared to the

21   "mega-fund" cases cited by El-Hani.  *See* Dkt. No. 196 at 7:5-8:21.  In these cases – nearly all of

22   which were consumer, securities, or mass tort class actions involving the aggregation of many

23   thousands of relatively small claims to create enormous common funds – the size of the common

24   fund was attributable at least as much, and sometimes more, to the sheer size of the class, rather

25   than the efforts of counsel.[23]  In such cases, courts may award counsel a smaller percentage of the

26   _____

27        [23] Several of the cases are distinguishable because of circumstances specific to the fee requests in
     those cases.  *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 106 F. Supp. 2d 721, 735-36 (D.N.J.
28   2000) (awarded 4.8% fee award *requested by* counsel in $1.8 billion deceptive sales practices class
     settlement, noting a higher award would be appropriate); *In re Baldwin-United Corp. Litig.*, 1986 WL 12195
     (S.D.N.Y.) (counsel requested 6.7% *interim* fee award, court approved a 4.1%); *In re MGM Grand Hotel*

1  fund than the 25% bench-mark, or award fees to class counsel using the lodestar method, to avoid a

2  windfall fee that could be unrelated to the work performed by counsel at the expense of the class.

3  *See, e.g. In re Bluetooth*, 654 F.3d at 943.

4        In this case, the size of the common fund is not a simply reflection of the class size but

5  rather due to the aggregation of very large settlement recoveries for a relatively modest number of

6  Class Members (2,016 instead of, for example,100,000 or 1,000,000).  If the Court approves

7  Counsel's request for a fee award of 22% of the common fund, the *pro rata* settlement shares of

8  the Class Members who submitted claims will continue to be substantial: over 700 Class Members

9  will receive settlement payments larger than $100,000 and the very largest recoveries exceed

10 $400,000.  *See* Myette Decl., ¶15, Ex. A.  Had each Class Member achieved the very same

11 recoveries in non-class litigation, they could have expected to pay to contingent fee counsel far

12 more than the 22% fee requested by counsel here, as contingent fees are typically in the 30-33%

13 range before trial and 40% during or after trial.

14       The more appropriate starting point for evaluating the fee motion in this case is the Ninth

15 Circuit's 25% benchmark for a common fund fee recovery.  And Plaintiffs here have requested a

16 common fund fee recovery below the benchmark to better approximate a market-rate fee,

17 confirmed by the lodestar cross-check which yields a multiplier of 3.5 to 4.  This approach is

18 consistent with the "mega-fund" cases relied on by objection, which used a lodestar cross-check to

19 confirm that the percentage awarded would appropriately compensate class counsel for risk, skill,

20 and taking the case on contingency notwithstanding use of a smaller common fund percentage. *See*

21 *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) (awarding 14.4%

22 fee equal to 3.97 lodestar multiplier from $1 billion common fund); *In re Shell Oil Refinery*, 155

23 F.R.D. 552 (E.D. La. 1994) (awarding 18.8% fee equal to 3.25 lodestar multiplier from $170

24 million common fund for over 18,000 claimants); *see also In re Washington Public Power Supply*

25

26 *Fire Litig.*, 660 F. Supp. 522 (D. Nev. 1987) (awarding total of 33.3% of fund to attorneys' fees, including
   7% to Plaintiffs Legal Committee); *Sioux Nation of Indians v. United States*, 227 Ct. Cl. 404, 650 F.3d 244,
27 247 (1981) (awarded maximum fees permitted under Indian Claims Commission Act, which capped fees at
   10%); *Bowling v. Pfizer*, 922 F.Supp. 1261, 1283-84 (S.D. Ohio 1996) (10% fee award, plus 10% of all
28 future contributions to settlement fund justified where counsel obtained a very quick result).

1   *Sys. Sec. Litig.* 19 F.3d 1291, 1297, 1301 (9th Cir. 1994) (district court abused its discretion by

2   refusing to award a risk multiplier).

3           Second, El-Hani's argument that Class Counsel's fee should be set using a pure lodestar

4   method should be rejected because it is made entirely in the abstract, without reference to the

5   arguments and evidence presented in Plaintiffs' fee motion as to why the "percentage of the fund"

6   method is more appropriate in this case, including the extraordinary risks undertaken by Counsel,

7   the longer than usual delay in resolution of the litigation, and the excellence of the result.  *See*

8   *generally* Dkt. Nos. 185; 186.

9           Third, Plaintiffs' do not dispute that Ninth Circuit precedent requires the Court to conduct a

10  lodestar-cross check to determine the reasonableness of the requested percentage of the common

11  fund and to show that requested fee is justified.  *See* Dkt. Nos. 185 at pps. 17-23; 186-190.

12  Specifically, Plaintiffs have shown that the hours comprising the lodestar fee were reasonable and

13  necessary to the results achieved for the Class, that the rates used in calculating the lodestar fee are

14  reasonable and appropriate, and that a multiplier in the range of 3.5 to 4 is justified under the

15  circumstances of this case.  Dkt. No. 185, 17:24-22:15.  Notably, El-Hani does not object to the

16  lodestar calculation, any of its components, or the multiplier.

17          Last, and perhaps most important, the lodestar cross-check clearly shows that a fair and

18  reasonable attorneys' fee in this case is nearly identical, whether analyzed under a pure lodestar

19  analysis or as a "percentage of-the-fund."  Under California's fee jurisprudence the relevant factors

20  to be considered in determining whether an upward adjustment of the lodestar fee is necessary to

21  fully compensate Counsel for their work include the quality of representation, the benefit obtained

22  for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.  *See*

23  *Mangold v. California Public Utilities Comm'n*, 67 F.3d 1470, 1473 (9th Cir. 1995) (in diversity

24  action, plaintiffs' entitlement to fees evaluated under substantive state law); *Ketchum v. Moses*, 24

25  Cal.4th 1122 (2001);  *Serrano v. Priest,* 20 Cal.3d 25, 35 (1977) (summarizing California attorney

26  fee jurisprudence holding that a fully compensatory fee in a contingent fee shifting case *starts* with

27  a lodestar figure adjusted based on factors specific to case in order to fix a fee representing the fair

28  market value for the services provided); *accord Chaudry v. City of Los Angeles*, 751 F.3d 1096,

1   1112 (9th Cir. 2014) (California law permits multiplier for contingent risk); *see also In re*

2   *Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 942 (9th Cir. 2011) (court may

3   adjust the lodestar figure to reflect a host of "reasonableness" factors, "including the quality of

4   representation, the benefit obtained for the class, the complexity and novelty of the issues

5   presented, and the risk of nonpayment"). In *Ketchum*, the California Supreme Court explained the

6   economic rationale for awarding a multiplier in contingent fee litigation: "A contingent fee must

7   be higher than a fee for the same legal services paid as they are performed. The contingent fee

8   compensates the lawyer not only for the legal services he renders but for the loan of those services.

9   24 Cal. 4th at 742. Otherwise, "[a] lawyer who both bears the risk of not being paid and provides

10  legal services is not receiving the fair market value of his work if he is paid only for the second of

11  these functions. If he is paid no more, competent counsel will be reluctant to accept fee award

12  cases." *Id*. (citations omitted).

13      The record here shows that class counsel's *unadjusted* lodestar fee in this case ranges

14  between $12.389 and $14.131 million dollars and also why an upward adjustment of 3.5 to 4

15  (generating a lodestar fee of $48 million – or approximately 22% of the common fund) is necessary

16  and appropriate to arrive at a fully compensatory fee in light of the specific and unusual facts and

17  circumstances of this case. As discussed in the fee motion, Class Counsel took on representation of

18  the *Alexander* Class in the face of considerable risks that were fully borne out, including a long

19  delay in payment for their services, and/or the possibility of no payment at all. See Dkt. No. 186,

20  ¶¶ 59-68. Importantly, neither El-Hani nor any other objector disputes that a lodestar enhancement

21  of between 3.5 and 4 is entirely justified in this case.

22      In sum, because the lodestar cross-check and circumstances of the class do not suggest that

23  Counsel's fee request results in a "windfall" and because Objector does not dispute Counsels'

24  justification for the lodestar or multipliers, El-Hani's objection should be overruled.

25  **C.  Confirmation of the Court's Provisional Class Certification of the Meal and Rest**

26  **Period Settlement Subclass is Appropriate.**

27      Plaintiffs also request that the Court confirm its provisional certification order and find that

28  the proposed Meal and Rest Period Settlement Subclass meets all the requirements under Rule 23.

1   Specifically, Plaintiffs ask the Court to finally certify the following subclass for settlement

2   purposes:

3       All persons who: 1) entered or will enter into a FXG Ground or FXG Home
        Delivery form Operating Agreement (now known as form OP-149 and form OP-
4       149 RES) between November 17, 2000 and October 15, 2007; 2) drove or will
        drive a vehicle on a full-time basis (meaning exclusive of time off for commonly
5       excused employment absences) since August 1, 2011, to provide package pick-up
        and delivery services pursuant to the Operating Agreement; and 3) were
6       dispatched out of a terminal in the State of California.

7

8       The provisionally certified Meal and Rest Period Settlement Subclass satisfies each of the

9   certification requirements that: (1) the individuals in the settlement class are so numerous that

10  joinder would be impracticable; (2) there is a question of law or fact common to the class; (3) the

11  named Plaintiff's claim is typical of the claims of the absent settlement class members; and (4)

12  Plaintiff and her counsel will adequately and fairly represent the interests of the absent settlement

13  class members.  *Hanlon*, 150 F.3d at 1019.  In addition, Plaintiff has established that the Subclass

14  is maintainable under Fed. R. Civ. P. 23(b)(3) because common questions "predominate over any

15  questions affecting only individual members," and class resolution "is superior to other available

16  methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

17  Accordingly, Plaintiffs request that the Court finally certify the subclass for settlement purposes

18  under Fed. R. Civ. P. 23(b)(3).

19      **D.  The Court-Ordered Notice Program Is Constitutionally Sound**

20      Under Rule 23(e), the Court "must direct notice in a reasonable manner to all Class

21  Members who would be bound by a propos[ed settlement]."  FED. R. CIV. P. 23(e) (1).  Class

22  Members are entitled to receive "the best notice practicable" under the circumstances.  *Burns v.*

23  *Elrod*, 757 F.2d 151, 154 (7th Cir. 1985).  Notice is satisfactory "if it generally describes the terms

24  of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to

25  come forward and be heard."  *Churchill Vill., L.L.C.*, 361 F.3d at 575 (internal citations omitted).

26  Moreover, notice that is mailed to each member of a class "who can be identified with reasonable

27  effort" constitutes reasonable notice.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).  For

28  any certified Rule 23(b)(3) class, the notice must inform Class Members "that the court will

1    exclude from the class any member who requests exclusion, stating when and how members may

2    elect to be excluded." FED. R. CIV. P. 23(c)(2)(B).

3         The notice plan provided for in the Settlement and approved by the Court in its October 22,

4    and November 9, 2015 Orders has been implemented and fully satisfies the notice standard.  The

5    Notice encouraged Settlement Class Members to contact the Settlement Administrator or Class

6    Counsel with any questions and provided their telephone numbers, mailing addresses, emails, and

7    web contact information.  Myette Decl. ¶¶ 3-6.  Substantial efforts were made by Rust and Class

8    Counsel to obtain updated contact information from Class Members, contact them, answer

9    questions, and assist with filing claims.  *Id*. at ¶¶ 9, 12, 13; Ross Decl. ¶ 4-7.

10        To ensure that Class Members could make a fully-informed decision whether to object to or

11   challenging the Settlement, the Notice Package contained an individual statement of the estimated

12   dollar amount of his or her share of the Settlement.  *See* Dkt. No. 149-2, Ex. C (Claim Form).  The

13   Settlement provided Class Members with 60 days after the Class Notice of Settlement was mailed

14   to object to or opt out of the Settlement.  As of March 2, 2016, there were no requests for exclusion

15   and *only three* Settlement Class Members have submitted any objection to the Settlement.  *See*

16   Myette Decl. ¶ 18, Dkt. Nos. 196, 198, 203.

17        The Notice and notice plan fulfilled all requirements of adequate notice and should be duly

18   approved.  *See Torrisi v. Tucson Elec. Power Co*., 8 F.3d 1370, 1374-75 (9th Cir. 1993); FED. R.

19   CIV. P. 23(C)(2); Manual for Complex Litig. (4th), § 21.312.

20   **VI.    CY PRES APPOINTMENT**

21        Pursuant to the Settlement, residual amounts not claimed and paid to Class Members will

22   be remitted to the Impact Fund and California Rural Legal Assistance Foundation as the *cy pres*

23   beneficiaries to the Settlement.  Plaintiffs respectfully requests confirmation of this *cy pres*

24   appointment.

25

26

27

28

## VII.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court grant final approval to the Settlement.

Respectfully submitted,
LEONARD CARDER, LLP

DATED: March 3, 2016                   By:      /s/ Beth Ross
                                                 Beth Ross
                                                 Aaron Kaufmann
                                                 David Pogrel
                                                 Elizabeth Gropman

                                                 *Attorneys for Plaintiffs*